1  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   ROBERT P. KRISTOFF (SB# 90874) bobkristoff@paulhastings.com
2  ZACHARY P. HUTTON (SB# 234737) zacharyhutton@paulhastings.com
   MICHAEL M. PFYL (SB# 240925) michaelpfyl@paulhastings.com
3  55 Second Street, Suite 2400
   San Francisco, CA  94105
4  Telephone: (415) 856-7000
   Facsimile: (415) 856-7100
5
   Attorneys for Defendant
6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 PAULA LABRIE, ALFREDO MACIAS,          CASE NO. 3:08-CV-03182 PJH
   PETER MILLMAN, TOM CHORTABTIM,
12 RAF SISON,                             **DEFENDANT'S MEMORANDUM OF
                                          LAW IN OPPOSITION TO
13          Plaintiffs,                   PLAINTIFFS' MOTION FOR
                                          CONDITIONAL CLASS
14     vs.                                CERTIFICATION AND NOTICE**

15 UPS SUPPLY CHAIN SOLUTIONS, INC.,
                                          Date:      March 18, 2009
16          Defendant.                    Time:      9:00 a.m.
                                          Judge:     Honorable Phyllis J. Hamilton
17                                        Courtroom: 3, 17th Floor

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ................................................................................................................ 2

    A.    Overview of SCS ..................................................................................... 2

    B.    Description of SCS' Independent Contractor Couriers ............................ 3

    C.    All Couriers Sign Independent Contractor Agreements That Restrict the Right of SCS to Control Their Work ..................................................... 4

    D.    SCS' Policies Require Dispatchers to Observe the Terms of Couriers' Agreements and Not to Exercise Control Over Couriers' Work ............... 5

    E.    Plaintiffs Allege that the Dispatchers With Whom They Worked Deviated From the Contracts and SCS' Policies and Exercised Control Over Their Work ........................................................................................... 6

    F.    A Nationwide Telephone Survey of Nearly 1,000 Couriers Indicates that Plaintiffs' Work Experiences Are Not Typical ...................................... 9

    G.    Plaintiffs Testified at Deposition that They Have No Personal Knowledge of the Work Performed by Other SCS Couriers .................................. 10

III.  ARGUMENT ..................................................................................................... 10

    A.    Plaintiffs Have Not Met Their Burden of Demonstrating, Even on a Conditional Basis, That They are Similarly Situated to All of the Individuals To Whom They Wish To Send Notice ............................... 10

        1.    The Determination of  Whether an Individual Is an Independent Contractor or Employer is an Inherently Individualized Inquiry ............. 12

        2.    Plaintiffs Have Not Demonstrated the Existence of an Unlawful Common Policy or Practice ......................................................... 14

        3.    The Nationwide Telephone Survey Demonstrates that Plaintiffs Are Not Similarly Situated to Other SCS Couriers ........................... 18

        4.    Plaintiffs' Declarations Have No Probative Value ................................... 19

        5.    Plaintiffs Admittedly Have No Personal Knowledge of the Work Performed by SCS Couriers Nationwide .................................... 21

    B.    The Air Couriers Decision is Inapposite to this Court's Determination ............... 22

    C.    Plaintiffs' Proposed Notice is Deficient ................................................. 22

IV.   CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Air Couriers Int'l v. Employment Dev. Dep't*,
  150 Cal. App. 4th 923 (Ct. App. 2007)................................................................................22

*Barfield v. New York City Health & Hosps. Corp.*,
  No. 05 CIV. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005)..............19

*Basco v. Wal-Mart Stores, Inc.*,
  No. 00-3184 Section "K"(4),
  2004 U.S. Dist. LEXIS 12441 (E.D. La. July 2, 2004) ...........................................................17

*Bonilla v. Las Vegas Cigar Co.*,
  61 F. Supp. 2d 1129 (D. Nev. 1999)......................................................................................17

*Boyd v. Jupiter Aluminum Corp.*,
  No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654 (N.D. Ind. May 31, 2006)..........23

*Carter v. Dutchess Cmty. Coll.*,
  735 F.2d 8 (2d Cir. 1984) .....................................................................................................13

*De La Cruz v. El Paso County Water Improvement Dist. No. 1*,
  No. EP-05-CV-206-FM, 2005 U.S. Dist. LEXIS 21244
  (W.D. Tex. Sept. 19, 2005) ...................................................................................................19

*Desimone v. Allstate Ins. Co.*,
  No. C 96-03606 CW, No. C 99-02074 CW, 2000 U.S. Dist. LEXIS 18097 (N.D. Cal.
  Nov. 7, 2000) .......................................................................................................................20

*Donihoo v. Dallas Airmotive, Inc.*,
  No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318 (N.D. Tex. Feb. 20, 1998)....................13

*Edwards v. City of Long Beach*,
  467 F. Supp. 2d 986 (C. D. Cal. 2006) ..................................................................................12

*Gerlach v. Wells Fargo & Co.*,
  No. C-05-0585 CW, 2006 U.S. Dist. LEXIS 24823 (N.D. Cal. Mar. 28, 2006).........11, 14, 23

*Harper v. Lovett's Buffet, Inc.*,
  185 F.R.D. 358 (M.D. Ala. 1999).........................................................................................17

*Held v. Nat'l R.R. Passenger Corp.*,
  101 F.R.D. 420 (D.D.C. 1984)..............................................................................................23

*Hinojos v. Home Depot, Inc.*,
  No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434 (D. Nev. Dec. 1, 2006) .......13, 17, 18, 22

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                              Page

3   *Hoffman-La Roche, Inc. v. Sperling,*
        493 U.S. 165 (1989)...................................................................................11, 23
4

5   *Johnson v. Am. Airlines, Inc.,*
        531 F. Supp. 957 (N.D. Tex. 1982) ..............................................................23
6

    *King v. ITT Cont'l Baking Co.,*
7       No. 84 C 3410, 1986 U.S. Dist. LEXIS 29321
        at *15 (N.D. Ill. Feb. 18, 1986) ....................................................................23
8

9   *Lee v. ABC Carpet & Home,*
        236 F.R.D. 193 (S.D.N.Y. 2006) ..................................................................14
10

11  *Lewis v. ASAP Land Express, Inc.,*
        No. 07-2226-KHV, 2008 U.S. Dist. LEXIS 40768 (D. Kan. May 21, 2008) ..........14

12  *Lima v. Int'l Catastrophe Solutions, Inc.,*
        493 F. Supp. 2d 793 (E.D. La. 2007)..............................................................11
13

14  *Montoya v. S.C.C.P. Painting Contractors, Inc.,*
        No. CCB-07-455, 2008 U.S. Dist. LEXIS 16354 (D. Md. Feb. 26, 2008)............14

15  *O'Donnell v. Robert Half Int'l, Inc.,*
        429 F. Supp. 2d 246 (D. Mass. 2006)..............................................................19
16

17  *Otto v. Pocono Health Sys.,*
        457 F. Supp. 2d 522 (M.D. Pa. 2006)..............................................................12
18

19  *Pfaahler v. Consultants for Architects, Inc.,*
        No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) .............passim

20  *Real v. Driscoll Strawberry Assocs., Inc.,*
        603 F.2d 748 (9th Cir. 1979) ...................................................................12, 22
21

22  *Rutherford Food Corp. v. McComb,*
        331 U.S. 722 (1947)........................................................................................12
23

24  *Thiessen v. GE Capital Corp.,*
        267 F.3d 1095 (10th Cir. 2001) .....................................................................11

25  *Trs. of Mich. Reg'l Council of Carpenters Employee Benefits Fund v. Fox Bros. Co.,*
        No. 05-CV-70262-DT, 2005 U.S. Dist. LEXIS 38928 (E.D. Mich. Dec. 27, 2005)..........20
26

27  *Watkins v. Milliken & Co.,*
        613 F. Supp. 408 (W.D.N.C. 1984) ...............................................................23
28

**TABLE OF AUTHORITIES**
(continued)

Page

*Weary v. Cochran,*
   377 F.3d 522 (6th Cir. 2004) .......................................................................................20

*West v. Border Foods, Inc.,*
   No. 05-2525, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006)...................................11

*White v. MPW Indus. Servs. Inc.,*
   236 F.R.D. 363 (E.D. Tenn. 2006) .......................................................................19

STATUTES

29 U.S.C. § 216(b) ...........................................................................................11, 12, 13

# I.   **INTRODUCTION**

Plaintiffs, former couriers who delivered parts for UPS Supply Chain Solutions, Inc. ("SCS"), ask the Court to conditionally certify this lawsuit as a nationwide collective action under the Fair Labor Standards Act ("FLSA"), based on their allegation that SCS misclassified them as independent contractors. The Court should not grant conditional certification, or authorize notice to putative class members, because Plaintiffs have failed to demonstrate that they are "similarly situated" to other SCS couriers throughout the United States.

Plaintiffs have not presented competent evidence to support their motion. Plaintiffs rely on virtually identical, conclusory declarations which state that other couriers' work "was basically the same" as their own.   The declarations do not provide any indication that the declarants have personal knowledge of the work performed by other couriers. Moreover, although the declarants claim they were subject to SCS' "instructions and rules," the instructions they describe do not suggest that they were misclassified or subject to any common, unlawful plan.

The one common thread linking Plaintiffs to the more than 2,500 couriers they seek to represent in this lawsuit is the contract they signed with SCS. The contract does not support Plaintiffs' claims; rather, it expressly establishes an independent contractor relationship, and confirms that SCS retains no right to control its couriers. Plaintiffs allege that the SCS dispatchers with whom they worked exercised control over them, despite the terms of their contract, by dictating their hours, their work conditions, and even their dress. However, SCS has enacted, and widely distributed, a nationwide policy that prohibits dispatchers from exercising the type of control Plaintiffs' describe. Therefore, Plaintiffs' claims do not rely on any common policy applied to all members of their proposed collective action; they rely on alleged policy deviations by individual dispatchers.

A nationwide telephone survey of nearly 1,000 SCS couriers establishes that the pictures painted by Plaintiffs, if true, are aberrations from the norm. At most, Plaintiffs may show that some dispatchers exercised more control over couriers than SCS' contracts and policy allowed. There is, however, no evidence to suggest that all, or even a majority of, couriers are

- 1 -

1   similarly situated in this regard.  Consequently, in order to resolve claims on behalf of couriers

2   throughout the United States, the Court would have to examine the work of individual couriers

3   and determine whether they worked with dispatchers who controlled their work in a manner that

4   violated both their contracts and SCS' policy.  This highly individualized inquiry, which focuses

5   on exceptions to SCS' common policies and practices, renders collective treatment inappropriate,

6   even at the notice stage.  As a result, the Court should deny Plaintiffs' motion for conditional

7   certification.

8   **II.    FACTS**

9        **A.    Overview of SCS**

10          SCS is not United Parcel Service — "Brown" — the package delivery company.

11   Rather, SCS is a sister company to UPS Brown and operates a logistics business.[1]  (Declaration of

12   Jackie Seguerra ("Seguerra Decl."), ¶ 4).  SCS is the only fully integrated logistics company in

13   the world.  (Seguerra Decl., ¶ 5).   It manages other companies' supply chains, i.e. inventories —

14   from the assembly line to the customer's locations — and does everything related to moving and

15   storing goods for its customers around the world.  (*Id.*)  SCS was formed through the acquisition

16   and combination of over 30 different logistics, warehousing, freight forwarding, customs

17   brokerage and transportation companies into one business.  (Seguerra Decl., ¶ 6).  SCS has

18   hundreds of distribution centers throughout the United States and abroad.  (*Id.*)  Each of these

19   distribution centers houses the scores of service offerings SCS provides to its customers.  (*Id.*)

20          SCS provides a variety of logistics services to its customers, including designing

21   and reengineering companies' supply chains, managing relationships with international and

22   domestic suppliers, improving product design, developing and improving planning and

23   procurement processes, facilitating compliance with international trade agreements and

24   regulations, and transporting and storing goods worldwide.  (Seguerra Decl., ¶ 7).  In sum, SCS

25   provides an integrated global network of logistics, consulting, international trade, warehousing,

26   and transportation services. (*Id.*)

27   _____

[1] SCS and UPS Brown are two separate, wholly owned subsidiaries of the same parent company.
28   (Seguerra Decl., ¶ 4).

- 2 -

1    In moving its customers' products from the assembly line to the ultimate user, SCS

2  utilizes a variety of independent transportation entities, including shipping lines, railroads,

3  independent trucking companies, independent truckers, delivery companies, and independent

4  contractor couriers. (Seguerra Decl., ¶ 8).  None of these transportation entities are owned,

5  operated or controlled by SCS.  (*Id.*)  They are independent contractors with whom SCS contracts

6  to transport its customers' goods and products.  (*Id.*)

7

8    **B.    Description of SCS' Independent Contractor Couriers**

9    Plaintiffs are former independent contractor couriers who provided expedited

10  same-day pick-up and delivery services for SCS' Service Parts Logistics unit. (Seguerra Decl., ¶

11  9).  Service Parts Logistics ("SPL") is one of SCS' many service offerings.  (Seguerra Decl., ¶

12  10).  The SPL service is designed to reduce service costs for companies, and accelerate the

13  movement of replacement parts, or parts needed for repairs.  (*Id.*)  The SPL unit maintains

14  inventories of replacement parts for customers, and coordinates the delivery of parts in the most

15  efficient manner.  (*Id.*)  For example, a computer manufacturer might use SPL to manage the

16  distribution of replacement parts to end-users.  (*Id.*)  If a customer of the computer manufacturer

17  needed a replacement part, SCS would locate the part in a distribution center or warehouse and

18  arrange for the most efficient method of delivery.  (*Id.*)  Depending on the delivery deadline, SCS

19  might arrange multi-day, next day or same day delivery service.  (*Id.*)

20    When SCS needs to make time-sensitive, same-day deliveries of service parts, it

21  either contacts independent delivery companies or independent contractor couriers.  (Seguerra

22  Decl., ¶ 11).  Less than 10% of the SPL unit's transportation of service parts is done by

23  independent contractor couriers.  (*Id.*)  SCS sets no requirements on when couriers must be

24  available, and couriers always have the option of accepting or declining any job offered by SCS.

25  (*Id.*)  Couriers are always paid by the job — either by the mile for longer runs or a fixed rate for

26  shorter deliveries.  (Seguerra Decl., ¶ 11).

27    Couriers who make deliveries for SCS receive their jobs from SCS dispatchers.

28  (Seguerra Decl., ¶ 12).  On days when a courier decides to work, the courier calls the active

- 3 -

DEF.'S MEM. OF LAW ISO OPP'N TO MOT. FOR
CLASS CERTIFICATION AND NOTICE

1   dispatch office, which may be local or in a different state, to let them know he or she is available

2   for deliveries. (*Id.*) The dispatcher places the courier's name on a list on a first-come, first-

3   served basis. (*Id.*) When SCS receives delivery orders from customers, dispatchers contact the

4   courier whose name is on the top of the list and offers a delivery job. (*Id.*) If the courier declines

5   the job, the dispatcher contacts the next courier on the list, until he or she finds a courier who

6   agrees to make the delivery. (*Id.*) If the courier accepts the job, he or she picks up the part,

7   delivers it, and ensures that the requisite paperwork is signed. (*Id.*) The courier can then get

8   back on the available list again by calling a dispatcher. (*Id.*)

9          In the three years preceding the filing of the complaint, over 2,500 couriers, from

10  45 different states and the District of Columbia, made deliveries for SCS. (Seguerra Decl., ¶ 13).

11  SCS has employed over 200 different individuals in multiple locations to dispatch SPL delivery

12  assignments to couriers during that time period. (*Id.*)

13        **C.    All Couriers Sign Independent Contractor Agreements That Restrict the
              Right of SCS to Control Their Work.**
14

15         All independent contractor couriers who make deliveries for SCS sign an

16  Independent Contractor Transportation Agreement that describes the terms of their relationship

17  with SCS. (Seguerra Decl., ¶ 14). All SCS couriers sign the same or similar contracts. (*Id.*)

18  Throughout the years, SCS has updated its contracts and required couriers to sign new

19  agreements. (*Id.*; Exs. 1 and 2).

20         SCS' contract with couriers expressly establishes an independent contractor

21  relationship. The most recent agreement, which was implemented in 2005, states that the

22  couriers' "relationship with SCS shall be that of an independent contractor and nothing in this

23  Agreement shall be construed to create a partnership, joint venture, agency, employer/employee,

24  or similar relationship between the parties." (Seguerra Decl., Ex. 1, p. A-1, § 7). The agreement

25  provides that couriers "shall not be subject to the general supervision or control of SCS and shall

26  be free to set [their] own business hours and procedures . . . ." (*Id.*). Couriers "maintain and

27  exercise full control over the Services performed . . . on behalf of SCS and its customers, and

28  over the means used to perform the Services." (*Id.* at p. A-1, §1). In addition, Couriers may

- 4 -

subcontract with others, and have others make deliveries for them.  (*Id.*)  SCS' prior agreement, which was implemented in 2001, contains nearly identical terms.  (Seguerra Decl., Ex. 2, §§ 9, 11).  Thus, the common policy that applies to all couriers nationwide is a lawful independent contractor agreement.

### D.   SCS' Policies Require Dispatchers to Observe the Terms of Couriers' Agreements and Not to Exercise Control Over Couriers' Work.

In March 2005, SCS implemented a policy governing dispatchers' interactions with couriers.  (Seguerra Decl., Ex. 3).  SCS periodically distributes the policy to dispatchers and their supervisors and requires them to sign an acknowledgement form indicating that they have received the policy and will comply with it.  (Seguerra Decl., ¶ 17).  The policy states that dispatchers must, among other things:

- Allow couriers to choose their own schedules and hours of work and work as much or as little as they want;
- Permit couriers to use their own "strategy and methods" when making deliveries;
- Allow couriers to choose the order in which they make pickups or deliveries and to choose the routes they take when making deliveries;
- Allow couriers to accept or turn down jobs at their discretion;
- Permit couriers to use whatever car or truck whey want to make pickups and deliveries;
- Allow couriers to negotiate special charges;
- Permit couriers to work for other companies, including other courier companies; and
- Treat couriers as non-employees or vendors.

(*Id.*)

The policy states that dispatchers must not:

- Require couriers to work a particular schedule, or to commit to a certain number of hours or jobs;

- 5 -

1   • Instruct couriers how to perform their duties or accomplish a job (including

2      requiring them to make pick-ups or deliveries in a certain order, or drive

3      specific routes);

4   • Require couriers to wear uniforms or adhere to a particular dress code;

5   • Require couriers to accept a particular job or threaten termination of services if a

6      courier declines;

7   • Demand that couriers show up at a business location in order to be dispatched;

8   • Require couriers to attend meetings;

9   • Distribute company policies or manuals to couriers;

10  • Require couriers to perform services exclusively for SCS; or

11  • Allow couriers to hold themselves out as employees of SCS (e.g., with business

12     cards or other associations with the company).

13  (*Id.*)

14      Thus, at all relevant times, SCS' policies required dispatchers to adhere to the

15  terms of SCS' contracts with couriers, treat them as independent contractors, and not exercise

16  control over their work.

17  **E.   Plaintiffs Allege that the Dispatchers With Whom They Worked Deviated
         From the Contracts and SCS' Policies and Exercised Control Over Their**

18  **Work.**

19      During their depositions, Plaintiffs testified that their relationship with SCS was

20  far different from the one established in their contracts and SCS' policies, because the particular

21  dispatchers they worked with exercised significant control over their work.

22      Plaintiffs admit that they dealt almost exclusively with dispatchers when they

23  made deliveries for SCS, and only infrequently interacted with other SCS personnel. (Chortabtim

24  Dep. 111:21-112:23, Dec. 16, 2008.; Macias Dep.133:17-135:6, Dec. 17, 2008; Millman Dep.

25  93:25-95:12, Dec. 15, 2008; Sison Dep. 98:23-101:9, Dec. 11, 2008; *see also* Declaration of

26  Paula LaBrie ("LaBrie Decl."), ¶ 9).[2] As such, their relationship with SCS was heavily influenced

27  _____

28  [2] Depositions of witnesses are cited as "([Last Name] Dep. [page]:[lines])." Cited deposition pages and exhibits are
    attached to the Declaration of Robert P. Kristoff.

                                        - 6 -

1    by the particular dispatchers with whom they worked.

2            Plaintiffs' deposition testimony demonstrates that dispatchers' application of the

3    rules varied from courier to courier.  Some of the Plaintiffs testified that the dispatchers with

4    whom they worked exercised control over them by requiring them to work specific schedules

5    (LaBrie Dep. 124:12-125:4, Dec. 9, 2008; Sison Dep. 85:5-86:5), not allowing them to turn down

6    jobs or retaliating against them when they did turn down jobs, (LaBrie Dep. 45:12-19; 54:2-55:2;

7    Macias Dep., 56:8-57:8; 81:10-15; Sison Dep., 54:12-18), refusing to allow them to negotiate

8    special rates (LaBrie Dep. 22:5-7; 87:24-89:5; Millman Dep. 173:12-174:17; Macias Dep. 79:23-

9    80:3), instructing them what route to take when they made deliveries (Sison Dep. 60:6-14),

10   requiring them to undergo training (Chortabtim Dep. 34:6-17; Macias Dep. 132:6-133:14),

11   requiring them to adhere to a dress code (Chortabtim Dep. 34:21-35:6; LaBrie Dep. 110:16-19;

12   Millman Dep. 165:12-166:14; Sison Dep. 123:8-14), and informing them that they could not

13   work for other delivery companies or hire others to make deliveries for them.  (LaBrie Dep.

14   28:15-29:21; 84:19-22; 116:8-13; Millman Dep. 149:20-150:6; Sison Dep. 97:1-10).  However,

15   other Plaintiffs testified that they could turn down deliveries without negative consequences

16   (Millman Dep. 192:21-193:4), could make their own schedule (Chortabtim Dep. 91:17-21;

17   Millman Dep. 128:6-129:22), chose the route they took when they made deliveries (Chortabtim

18   Dep. 71:8-10), never underwent training (LaBrie Dep. 96:12-16), and made deliveries for other

19   companies during the time period that they made deliveries for SCS  (Millman Dep. 143:15-

20   147:10).

21            Plaintiffs also testified that the amount of control exerted over them varied,

22   depending on the dispatchers with whom they worked.  For example, some dispatchers required

23   Plaintiffs to be at the warehouse before they could get a delivery, while others only required them

24   to be within a close time frame so that they could meet their delivery deadlines.  (Chortabtim

25   Dep. 47:2-48:3; LaBrie Dep. 150:23-152:17; 153:20-154:6; 158:2-22; Millman Dep. 53:11-15;

26   54:3-23; 64:7-22; 71:7-23).  Some dispatchers instructed Plaintiffs to deliver parts in a certain

27   order, or take a specific route, while others did not. (Chortabtim Dep. 70:9-20; 70:24-71:10;

28   LaBrie Dep. 165:19-167:4; Macias Dep. 32:14-24; 34:14-18; Millman Dep. 107:2-19; 108:4-25;

- 7 -

1 Sison Dep. 46:3-25; 47:19-48:4; 60:6-14; 60:20-24).   In addition, some dispatchers required

2 Plaintiffs to obtain approval in order to make multiple deliveries, while others did not.

3 (Chortabtim Dep. 65:5-9; LaBrie Dep. 163:14-164:15; Millman Dep. 56:2-11; Sison Dep. 38:8-

4 15; 51:24-52:4).   Thus, Plaintiffs' own testimony establishes that they are not even similarly

5 situated to each other.

6          Most SCS dispatchers, however, adhere to the company's policies and do not

7 exercise the type of control described by Plaintiffs.  In support of this motion, current and former

8 SCS dispatchers who worked in locations throughout the United States, have attested that couriers

9 determine when they want to work,[3]  can turn down jobs offered to them for any reason,[4]  actually

10 do turn down jobs for many different reasons,[5] are permitted to have others make deliveries for

11 them,[6] are permitted to make deliveries for other companies,[7] negotiate special rates of pay,[8]  do

12 not have to be at any particular place in order to receive delivery assignments,[9] and are not told

13 what route to take when making deliveries, or told the order in which they should make

14 [3] *See* Declaration Benjamin Bower ("Bower Decl."), ¶ 6; Declaration of Birda Gardner ("Gardner Decl."), ¶ 6; Declaration of Kris Gonzales ("Gonzales Decl."), ¶ 6; Declaration of Pierre Griffin

15 ("Griffin Decl."), ¶ 6; Declaration of Angela Mapp ("Mapp Decl."), ¶ 6; Declaration of Peter Mattarese ("Mattarese Decl."), ¶ 6; Declaration of Kirti Naik ("Naik Decl."), ¶ 6; Declaration of

16 Daniel Silva ("Silva Decl."), ¶ 6; Declaration of Bryon Thompson ("B. Thompson Decl."), ¶ 6; Declaration of Sabrina Thompson ("S. Thompson Decl."), ¶ 6; Declaration of Cedric Williams

17 ("Williams Decl."), ¶ 6.

18 [4] *See* Bower Decl., ¶ 8; Gardner Decl., ¶ 8; Gonzales Decl., ¶ 8; Griffin Decl., ¶ 8; Mapp Decl., ¶ 8; Mattarese Decl., ¶ 8; Naik Decl., ¶ 8; Silva Decl., ¶ 8; B. Thompson Decl., ¶ 8; S. Thompson

19 Decl., ¶ 8; Williams Decl., ¶ 8.

20 [5] *See* Bower Decl., ¶ 9; Gardner Decl., ¶ 9; Gonzales Decl., ¶ 9; Griffin Decl., ¶ 9; Mapp Decl., ¶ 9; Mattarese Decl., ¶ 9; Silva Decl., ¶ 9; B. Thompson Decl., ¶ 9; S. Thompson Decl., ¶ 9;

21 Williams Decl., ¶ 9.

22 [6]  *See* Bower Decl., ¶ 13; Gardner Decl., ¶ 13; Gonzales Decl., ¶ 13; Griffin Decl., ¶ 13; Mapp Decl., ¶ 13; Mattarese Decl., ¶ 13; Naik Decl., ¶ 12; Silva Decl., ¶ 13; B. Thompson Decl., ¶ 13;

23 S. Thompson Decl., ¶ 13; Williams Decl., ¶ 13.

24 [7] *See* Mattarese Decl., ¶ 14; Naik Decl., ¶ 14; S. Thompson Decl., ¶ 14; Williams Decl., ¶ 15.

25 [8] *See* Bower Decl., ¶ 6; Mapp Decl., ¶ 14; Naik Decl., ¶ 13; B. Thompson Decl., ¶ 14; Williams

26 Decl., ¶ 14.

27 [9] *See* Bower Decl., ¶ 7; Dec. of Birda Gardiner, ¶ 7; Gonzales Decl., ¶ 7; Griffin Decl., ¶ 7; Mapp Decl., ¶ 7; Mattarese Decl., ¶ 7; Naik Decl., ¶ 7; Silva Decl., ¶ 7; B. Thompson Decl., ¶ 7; S.

28 Thompson Decl., ¶ 7; Williams Decl., ¶ 6.

- 8 -

deliveries.[10]

In sum, the Plaintiffs testified that they were subject to a state of affairs that diverged from both official SCS policy and the experience of most other couriers.

**F.      A Nationwide Telephone Survey of Nearly 1,000 Couriers Indicates that Plaintiffs' Work Experiences Are Not Typical.**

A recent telephone survey conducted on behalf of SCS asked nearly 1,000 current and former couriers across the United States about their relationships with the SCS, resulting in far more in-depth portrait of SCS operations than the individual experiences described by Plaintiffs.

The telephone survey, which was conducted by E. Deborah Jay, Ph.D., the C.E.O. of Field Research Group, demonstrates that most couriers are not subject to the strict control described by Plaintiffs.  The majority of respondents stated that:

- They choose the days and hours when they are available to make SCS deliveries (93%).

- They choose the routes they take to SCS delivery locations (89%).

- They choose the order in which they make deliveries (52%).

- They turn down SCS deliveries that they are offered (58%).

- They are not required to undergo any training, other than Transportation Security Administration training for airport deliveries (62%).

- They do not wear a uniform to make SCS deliveries (96%).

- The vehicle they use to make deliveries does not say "SCS" on it (97%).

(Declaration of E. Deborah Jay, Ph.D. ("Jay Decl."), pp. 2, 19, 31, 33, 35, 41,60, 63).   In addition, almost one-third of the survey respondents (32%) indicated that they have done one or more of the following things: negotiated a higher rate for SCS deliveries; made paid deliveries for others during the time period that they made deliveries for SCS; formed a corporation mainly for the purpose of making deliveries; or used other people to make SCS deliveries for them.  (Jay

---

[10] *See* Bower Decl., ¶ 12; Dec. of Birda Gardiner, ¶ 12; Gonzales Decl., ¶ 12; Griffin Decl., ¶ 12; Mapp Decl., ¶ 12; Mattarese Decl., ¶ 12; Naik Decl., ¶ 11; Decl. Daniel Silva, ¶ 12; B. Thompson Decl., ¶ 12; S. Thompson Decl., ¶ 12; Williams Decl., ¶ 12.

-9-

1   Decl., pp. 2, 44, 49, 55, 66).

2           Furthermore, although Plaintiffs contend that they "could not turn down

3   assignments," couriers across the country stated that they turn down assignments for a variety of

4   reasons. (Jay Decl., p. 23). Twenty-six percent of the survey respondents said they "often" or

5   "very often" consider the timing of a delivery in relation to other deliveries when deciding

6   whether to accept an SCS delivery; 25% said they "often" or "very often" consider the amount

7   SCS will pay for the delivery; 22% said they "often" or "very often" consider the delivery

8   mileage; 18% said they "often" or "very often" consider traffic patterns; 18% said they "often" or

9   "very often" consider other plans or commitments for the day; and 16% said they "often" or "very

10  often" consider the location or direction of the delivery. (Jay Decl., pp. 22, 23). In addition, 27%

11  of respondents also said they "often" or "very often" consider and evaluate something else when

12  deciding whether to accept an SCS delivery. (Jay Decl., p. 22, App. E). Thus, couriers across the

13  country turn down jobs for a host of reasons.

14      **G.      Plaintiffs Testified at Deposition that They Have No Personal Knowledge of
                  the Work Performed by Other SCS Couriers.**
15

16          Although Plaintiffs assert that they are "similarly situated" to couriers across the

17  United States, they testified at deposition that they have no personal knowledge of the work

18  performed by couriers outside of California. (Chortabtim Dep. 139:12-17; LaBrie Dep. 185:5-16;

19  Macias Dep. 141:23-142:1; Millman Dep. 174:19-23; Sison Dep. 131:9-14). Plaintiffs also

20  testified that they do not know whether other couriers were subject to fewer rules than they were;

21  whether other couriers have incorporated businesses; whether other couriers negotiate the rates

22  they are paid for deliveries; or whether other couriers prefer to be classified as independent

23  contractors. (Chortabtim Dep. 139:18-141:1; LaBrie Dep. 185:17-187:17; Macias Dep. 142:2-20;

24  Millman Dep. 174:24-175:11; Sison Dep. 131:15-133:5).

25  **III.    ARGUMENT**

26      **A.      Plaintiffs Have Not Met Their Burden of Demonstrating, Even on a
                  Conditional Basis, That They are Similarly Situated to All of the Individuals
27                To Whom They Wish To Send Notice.**

28          The collective action procedure is available only where the employees in the
                                        - 10 -

proposed group are "similarly situated" to one another. 29 U.S.C. § 216(b). Only where this standard has been met can the process facilitate the "efficient resolution . . . of [material] common issues of law and fact." *Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989). In such a case, representative proof from a comparatively small number of witnesses can provide the information the jury needs to determine, for example, whether a group of individuals has been properly classified as independent contractors. Those witnesses can testify about the experiences and duties of the group, and — because the court has concluded that all of the class members do essentially the same thing and have had essentially the same experience — the fact-finder can determine whether *all* of the class members are entitled to compensation without the months of trial time that would otherwise be necessary to hear from them all. That is why the authority to issue notice in the first instance is left to the discretion of the district court, and why the Supreme Court has cautioned that this authority be exercised only in "appropriate cases." *Id.* at 169.

While the "standard at this stage is 'not particularly stringent' . . . it is by no means automatic." *Lima v. Int'l Catastrophe Solutions, Inc.*, 493 F. Supp. 2d 793, 798 (E.D. La. 2007) (internal citations omitted). "[B]efore subjecting an employer to the burdens of a collective action, the plaintiffs must establish a colorable basis for their claim that a manageable class of 'similarly situated' plaintiffs exist." *West v. Border Foods, Inc.*, No. 05-2525, 2006 U.S. Dist. LEXIS 96963, at *28 (D. Minn. June 12, 2006). Courts will not accept mere allegations that plaintiffs are similarly situated without supporting evidence. *See, e.g., Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772, at * 6 (N.D. Ill. Feb. 8, 2000) (insufficient evidence that plaintiff was similarly situated to putative class members because he had no personal knowledge of "the work other workers performed, the circumstances under which work was performed, or the circumstances of potential claimants"). Instead, in order to gain conditional certification, Plaintiffs must demonstrate that "the putative class members were together the victims of a single decision, policy, or plan." *Gerlach v. Wells Fargo & Co.*, No. C-05-0585 CW, 2006 U.S. Dist. LEXIS 24823, at *6-7 (N.D. Cal. Mar. 28, 2006) (citing *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)).

Plaintiffs have not met their burden because (1) the determination of whether an

- 11 -

1   individual is properly classified as an independent contractor is an inherently fact-specific inquiry

2   that is not prone to group adjudication; (2) Plaintiffs' claims rely on alleged *exceptions* to SCS'

3   policies and practices, rather than a common unlawful policy that applied to all couriers; (3) the

4   nationwide telephone survey of SCS couriers demonstrates that Plaintiffs are not similarly

5   situated to other couriers; (4) Plaintiffs' declarations have no probative value; and (5) Plaintiffs'

6   admittedly have no personal knowledge of the work performed by couriers nationwide.[11]

7          **1.**     **The Determination of Whether an Individual Is an Independent**
                           **Contractor or Employer is an Inherently Individualized Inquiry**

8

9          The determination of whether a person is properly classified as an independent

10  contractor is a fact-intensive analysis that depends on a variety of factors, including:

11         1)     the degree of the alleged employer's right to control the
                    manner in which the work is to be performed;

12

13         2)     the alleged employee's opportunity for profit or loss
                    depending upon his managerial skill;

14         3)     the alleged employee's investment in equipment or materials
                    required for his task, or his employment of helpers;

15

16         4)     whether the service rendered requires a special skill;

17         5)     the degree of permanence of the working relationship; and

18         6)     whether the service rendered is an integral part of the
                    alleged employer's business.

19

20  *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).  The presence of any

21  one of these factors is not dispositive; instead, the determination rests "upon the circumstances of

22  the whole activity." *Id.*, *quoting Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947).

23  [11] Numerous courts have held that a plaintiff cannot simultaneously maintain an FLSA collective
    action and Rule 23 class action because the "opt-in" procedures that apply in a collective action

24  are irreconcilable with the "opt-out" procedures in a class action.  *See e.g., Otto v. Pocono Health
    Sys.*, 457 F. Supp. 2d 522, 524 (M.D. Pa. 2006) (granting defendants' motion to dismiss

25  plaintiff's Rule 23 claim because allowing a Rule 23 opt-out class action to proceed with a
    Section 216(b) opt-in collective action "would essentially nullify Congress's intent in crafting

26  Section 216(b) and eviscerate the purpose of Section 216(b)'s opt-in requirement"); *Edwards v.
    City of Long Beach*, 467 F. Supp. 2d 986, 992 (C. D. Cal. 2006) ("confusion would result from

27  requiring potential plaintiffs to both opt-in and opt-out of the claims in the suit").  Consequently,
    Plaintiffs cannot pursue their Rule 23 class claims if they proceed with an "opt-in" FLSA

28  collective action.

- 12 -

1   However, the right to control the manner and means of a person's work is a "crucial factor in

2   determining whether an employment relationship exists." *Carter v. Dutchess Cmty. Coll.,* 735

3   F.2d 8, 12 (2d Cir. 1984).

4         Plaintiffs' claims are not susceptible to resolution in a collective action because

5   they require detailed, individualized proof of the work performed by thousands of couriers across

6   the United States. Plaintiffs' proposed collective action would group together over 2,500

7   couriers, who have worked in 45 different states, with more than 200 different dispatchers, and

8   would require the court to apply a highly fact-specific test to determine whether some or all of

9   these individuals were improperly classified as independent contractors. Numerous courts have

10  denied conditional certification in cases such as this, where resolution of the claims would require

11  a fact-specific analysis of many individuals' job duties. *See, e.g., Pfaahler,* 2000 U.S. Dist.

12  LEXIS 1772 at *4 (denying conditional certification because the determination of "who is an

13  independent contractor and who is an employee" would require a "fact-intensive, individual

14  determination as to the nature of each potential claimant's employment relationship"); *Hinojos v.*

15  *Home Depot, Inc.,* No. 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434, at * 7 (D. Nev. Dec. 1,

16  2006) ("where FLSA claims require significant individual determinations and considerations,

17  they are inappropriate for conditional certification") (string citation omitted); *Donihoo v. Dallas*

18  *Airmotive, Inc.,* No. 3:97-CV-0109-P, 1998 U.S. Dist. LEXIS 2318, at *4-5 (N.D. Tex. Feb. 20,

19  1998) ("an inquiry into the employee's specific job duties . . . is not appropriate in a class lawsuit

20  under Section 216(b)").

21        In *Pfaahler,* the plaintiffs sought conditional certification of a collective action

22  involving approximately 140 workers in Illinois whom he claimed were misclassified as

23  independent contractors. *Pfaahler,* 2000 U.S. Dist. LEXIS 1772 at *2. The court denied

24  conditional certification of the claims, noting:

25          In order to determine who is an independent contractor and who is
        an employee, the court would be required to make a fact-intensive,

26          individual determination as to the nature of each potential
        claimant's employment relationship with [the defendant] . . .

27          Where this is the case, certification of a collective action under the
        FLSA is inappropriate.

28

- 13 -

DEF.'S MEM. OF LAW ISO OPP'N TO MOT. FOR
CLASS CERTIFICATION AND NOTICE

1   *Id.* at *4. In this case, the Court would be required to conduct an equally fact-intensive analysis

2   of the employment relationship of 2,500 individuals who have worked in 45 different states with

3   over 200 different dispatchers. This task would be unmanageable, especially given that, as

4   described below, Plaintiffs' experience is dramatically different from descriptions given by

5   couriers nationwide.

6          The cases cited by Plaintiffs, in which courts granted conditional certification of

7   independent contractor misclassification claims, are distinguishable. In *Lewis v. ASAP Land*

8   *Express, Inc.*, No. 07-2226-KHV, 2008 U.S. Dist. LEXIS 40768, at * 4 (D. Kan. May 21, 2008),

9   the Court noted that the defendant *conceded that plaintiffs met their burden* to "provide

10  substantial allegations that they were together the victims of a single decision, policy or plan."

11  SCS does not concede that Plaintiffs have met their burden here. In *Lee v. ABC Carpet & Home*,

12  236 F.R.D. 193, 198 (S.D.N.Y. 2006), the court granted conditional certification in a case

13  involving 44 workers who provided carpet installation services for the defendant. *Lee* involved

14  dozens of workers, not thousands, so there was less risk that individualized issues would

15  overwhelm the litigation. Similarly, in *Montoya v. S.C.C.P. Painting Contractors, Inc.*, No.

16  CCB-07-455, 2008 U.S. Dist. LEXIS 16354, at *9 (D. Md. Feb. 26, 2008), the court conditionally

17  certified a collective action involving 50 to 90 workers. *Montoya* does not stand for the

18  proposition that courts should conditionally certify collective actions involving thousands of

19  individuals based on anecdotal statements by a handful of people.

20         The determination of whether SCS properly classified some or all of its 2,500

21  couriers as independent contractors would require "a fact-intensive, individual determination as to

22  the nature of each potential claimant's employment relationship." *Pfaahler*, 2000 U.S. Dist.

23  LEXIS 1772 at *4. Consequently, the claims are ill-suited for collective treatment.

24         **2.    Plaintiffs Have Not Demonstrated the Existence of an Unlawful**
             **Common Policy or Practice.**
25

26         In order to demonstrate that they are similarly situated to SCS couriers'

27  nationwide, Plaintiffs must demonstrate that they "were together the victims of a single decision,

28  policy, or plan." *Gerlach*, 2006 U.S. Dist. LEXIS 24823 at *6-7. Plaintiffs cannot meet that

- 14 -

1   burden because (a) SCS' policies refute, rather than support Plaintiffs' claims; and (b) the claims

2   are founded on individualized exceptions to SCS' policies, where dispatchers allegedly

3   overstepped their authority and exercised more control over Plaintiffs than their contracts and

4   SCS' policies allowed.

5           **a.      SCS' Common Policies Do Not Support Plaintiffs' Claims;**
                    **They Refute Them.**

6

7           The common thread linking the more than 2,500 couriers who have made

8   deliveries for SCS is that they have all signed contracts that expressly establish an independent

9   contractor relationship, and bar SCS from exercising control over their work. (*See* Seguerra

10  Decl., ¶ 14 and Exs. 1 & 2).  In particular, the contracts reserve the couriers' right to exercise

11  independent judgment, to set their own hours and establish their own business procedures, to hire

12  people to work for them, and to retain full control of the services they perform for SCS. (*Id.*)

13          Furthermore, SCS enacted, and widely distributed, an official policy to ensure that

14  dispatchers did not exercise more control over couriers than their contracts allowed.  The policy

15  expressly states that dispatchers must allow couriers to choose their own schedules and hours of

16  work, work as much or as little as they want, accept or reject jobs at their own discretion, use

17  their own strategy and methods when making deliveries, choose the order in which they make

18  pickups and deliveries, choose the routes they take when making deliveries, use whatever car or

19  truck they want when making deliveries, negotiate special charges, and work for other companies.

20  (Seguerra Decl., ¶ 17 and Ex. 3).  The policy forbids dispatchers to, among other things, require

21  couriers to work a particular schedule or to commit to a certain number of hours or jobs, instruct

22  couriers how to perform their duties (including requiring them to make pick-ups and deliveries in

23  a certain order or to drive specific routes), demand that couriers show up at a business location in

24  order to be dispatched, require couriers to perform services exclusively for SCS, or allow couriers

25  to hold themselves out as employees of SCS. (*Id.*)  Consequently, SCS' policy required

26  dispatchers to treat couriers as independent contractors and not exercise control over their work.

27

28                                           - 15 -

1

       **b.**    **Plaintiffs' Claims Are Founded on Individualized Exceptions to SCS' Policies.**

2

3          Plaintiffs' claims do not rely on any common policy or practice at SCS. Instead,

4 they rely on individualized exceptions where dispatchers allegedly deviated from the company's

5 rules. As a result, it would be unmanageable to resolve the claims of thousands of couriers

6 nationwide in a single collective action.

7          Plaintiffs' deposition testimony illustrates that couriers' relationships with SCS are

8 heavily influenced by their interactions with dispatchers. Plaintiffs testified that they dealt almost

9 exclusively with dispatchers when they made deliveries for SCS, and only infrequently interacted

10 with other SCS personnel. (Chortabtim Dep. 111:21-112:23; Macias Dep. 133:17-135:6;

11 Millman Dep. 93:25-95:12; Sison Dep. 98:23-101:9; LaBrie Decl. ¶ 9). Further, Plaintiffs

12 testified that the amount of control exerted over them varied from dispatcher to dispatcher. For

13 example, Plaintiffs testified that some dispatchers required them to report to specific locations in

14 order to receive assignments, while others did not (Chortabtim Dep. 47:2-48:3; LaBrie Dep.

15 150:23-152:17; 153:20-154:6; 158:2-22; Millman Dep. 53:11-15; 54:3-23; 64:7-22; 71:7-23);

16 some dispatchers instructed them to deliver parts in a certain order, or take a specific route, and

17 others did not (Chortabtim Dep. 70:9-20; 70:24-71:10; LaBrie Dep. 165:19-167:4; Macias Dep.

18 32:14-24; 34:14-18; Millman Dep. 107:2-19; 108:4-25; Sison Dep. 46:3-25; 47:19-48:4; 60:6-14;

19 60:20-24); and some dispatchers required them to obtain approval in order to make multiple

20 deliveries, while others did not (Chortabtim Dep. 65:5-9; LaBrie Dep. 163:14-164:15; Millman

21 Dep. 56:2-11; Sison Dep. 38:8-15; 51:24-52:4). Thus, the amount of control exercised over even

22 a small group of couriers is not uniform. It varies, depending on the dispatcher.

23          During their depositions, Plaintiffs testified that the dispatchers they worked with

24 controlled them by not allowing them to set their own schedules, turn down assignments,

25 negotiate special rates, work for other companies, hire others to make deliveries for them, or even

26 determine their route and the order of their deliveries. (LaBrie Dep. 28:15-29:21; 45:12-19; 54:2-

27 55:2; 84:19-22; 116:8-13; 124:12-125:4; Macias Dep. 56:8-57:8; 81:10-15; Millman Dep.

28

- 16 -

DEF.'S MEM. OF LAW ISO OPP'N TO MOT. FOR CLASS CERTIFICATION AND NOTICE

149:20-150:6; Sison Dep. 54:12-18; 85:5-86:5; 97:1-10).[12]  All of these acts, if true, involved

dispatchers who deviated from SCS' policies.

        Because Plaintiffs' claims are based on alleged violations of SCS' common

policies, in which dispatchers allegedly exercised more control than SCS' contracts and policies

allowed, the court would have to examine the treatment of each individual courier to determine

whether he or she was treated as an independent contractor or an employee.  The difficulty of

determining which of the more than 2,500 couriers qualify as independent contractors would be

compounded by the large number of dispatchers who have worked for SCS during the liability

period.  From 2005 to present, SCS has employed more than 200 different individuals to dispatch

delivery assignments to couriers. (Seguerra Decl., ¶ 13).  Therefore, a trial to resolve these

claims would focus on decentralized decisions made by hundreds of individual dispatchers, and

would require an analysis of "specific circumstances personal to [each worker] rather than any

generally applicable policy or practice." *Hinojos,* 2006 U.S. Dist. LEXIS 95434 at * 5 (quoting

*Bonilla v. Las Vegas Cigar Co.,* 61 F. Supp. 2d 1129, 1138, n. 6 (D. Nev. 1999)); *see also Basco*

*v. Wal-Mart Stores, Inc.,* No. 00-3184 Section "K"(4), 2004 U.S. Dist. LEXIS 12441, at *22

(E.D. La. July 2, 2004) (where defendant had official policy requiring payment for all working

time, and where defendant asserted that deviations from that policy occurred "on a manager-by-

manager and associate-by-associate basis involving particular circumstances and anecdotal

testimony," plaintiff failed to "demonstrate identifiable facts or legal nexus that [bound] the

claims so that hearing the cases together [would promote] judicial efficiency"); *Harper v. Lovett's*

*Buffet, Inc.,* 185 F.R.D. 358, 363 (M.D. Ala. 1999) (denying conditional certification where

employees worked in different facilities, in different states, for different managers, in different

work conditions).

---

[12] Plaintiffs' experiences in this regard were not uniform, however.  Some testified that they were permitted to turn down deliveries, chose the route they took when they made deliveries, never underwent training, and made deliveries for other companies during the time period that they made deliveries for SCS. (Chortabtim Dep. 71: 8-10; 17-21; LaBrie Dep. 96: 12-16; Millman Dep. 143: 15-18; 192:21-193:4).  Thus, even the five named Plaintiffs are not a homogenous group.

- 17 -

DEF.'S MEM. OF LAW ISO OPP'N  TO MOT. FOR
CLASS CERTIFICATION AND NOTICE

### 3.   The Nationwide Telephone Survey Demonstrates that Plaintiffs Are Not Similarly Situated to Other SCS Couriers.

Field Research Group's nationwide telephone survey of nearly 1,000 current and former couriers further demonstrates that Plaintiffs are not similarly situated to other SCS couriers across the country.

The majority of respondents to the survey stated that they choose the days and hours when they are available to make SCS deliveries (93%); choose the routes they take to SCS delivery locations (89%); choose the order in which they make deliveries (52%); turn down SCS deliveries that they are offered (58%); are not required to undergo any training, other than training required by the Transportation Security Administration for airport deliveries (62%); do not wear a uniform to make SCS deliveries (96%); and their vehicle does not say "SCS" on it (97%). (Jay Decl., pp. 2, 19, 22, 31, 33, 41, 60, 63). Further, almost one-third of the survey respondents (32%) indicated that they have done one or more of the following things: negotiated a higher rate for some SCS deliveries; made paid deliveries for others during the time period that they made deliveries for SCS; formed a corporation mainly for the purpose of making deliveries; or used other people to make SCS deliveries for them. (Jay Decl., pp. 2, 44, 49, 55, 66).

Plaintiffs claim that when they made deliveries for SCS, they could not choose their schedule, their routes, or the order in which they made deliveries, and could not turn down assignments, negotiate higher rates for deliveries, or have other people make SCS deliveries for them. (LaBrie Dep. 28:15-29:21; 45:12-19; 54:2-55:2; 84:19-22; 116:8-13; 124:12-125:4; Macias Dep. 56:8-57:8; 79:23-80:3; 81:10-15; Millman Dep. 149:20-150:6; 173:12-174:17; Sison Dep. 54:12-18; 85:5-86:5; 97:1-10). Couriers nationwide describe having very different relationships with SCS. They operate independently, work whenever they want, and are treated in a manner consistent with their contracts and SCS' policies. Therefore, Plaintiffs are not similarly situated to other couriers throughout the United States. *See, e.g., Hinojos,* 2006 U.S. Dist. LEXIS 95434, at *6 (denying conditional certification, in part, because a "survey of defendant's current and former . . . employees belies the existence of any common practice tying plaintiffs with other . . . employees").

- 18 -

### 4. Plaintiffs' Declarations Have No Probative Value.

In support of their motion, Plaintiffs submitted declarations of 25 other couriers. These template declarations are *identical* in nearly every respect, save the declarant's name. Although Plaintiffs contend that the declarations demonstrate that SCS' couriers nationwide are similarly situated to each other, the declarations do not support that claim.

First, all 25 declarants state, in identically-worded language, that other couriers' work "was basically the same as mine and they had to comply with the same rules." [*See* Declaration of Eleanor Morton in Support of Plaintiffs' Motion for Conditional Class Certification and Notice, Exhibit 2, Declarations of Current and Former SCS Drivers ("Plaintiffs' Driver Declarations"), ¶¶ 5, 11]. These conclusory statements are not supported by any personal knowledge or predicate facts. Most of the declarants have no knowledge of the work performed by couriers nationwide, as they worked out of only one warehouse. Anchorless, conclusory declarations of this sort do not suffice to show similarity. *White v. MPW Indus. Servs. Inc.*, 236 F.R.D. 363, 369 (E.D. Tenn. 2006), is particularly instructive. The court there issued notice, but only after holding the plaintiff to an appropriate evidentiary standard: *"affidavits submitted at the notice stage must be based on the personal knowledge of the affiant.* If the Court were to conclude otherwise, affidavits submitted would not be any more probative than the bare allegations in the complaint, and the requirement of factual support would be superfluous." *Id.* (emphasis added).[13]

Second, the declarants state that they were required to perform their work "according to SCS' instructions and rules regarding dispatching, deliveries, and pay." (*See* Plaintiffs' Driver Declarations, ¶ 8). In particular, the declarants state that dispatchers gave them

---

[13] *See also O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250 (D. Mass. 2006) ("affidavits [were offered by] the individual plaintiffs, [but] neither of [them] has personal knowledge of the practices . . . in other divisions or offices"); *Barfield v. New York City Health & Hosps. Corp.*, No. 05 CIV. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884, at *3 (S.D.N.Y. Nov. 17, 2005) (plaintiff failed to make even a "modest factual showing" because he presented "nothing but limited anecdotal hearsay"); *De La Cruz v. El Paso County Water Improvement Dist. No. 1*, No. EP-05-CV-206-FM, 2005 U.S. Dist. LEXIS 21244, at *7 (W.D. Tex. Sept. 19, 2005) ("Plaintiffs produce only conclusory statements that do not even meet a 'modest factual showing.'").

- 19 -

DEF.'S MEM. OF LAW ISO OPP'N TO MOT. FOR
CLASS CERTIFICATION AND NOTICE

1   information necessary to make deliveries, required them to update SCS on the status of deliveries,

2   and required them to notify SCS if they were unable to meet a deadline or deliver a part to the

3   intended recipient. (*See* Plaintiffs' Driver Declarations, ¶¶ 14, 15, 16). The declarants also state

4   that they were required to complete certain paperwork in order to receive payment for a job. (*See*

5   Plaintiffs' Driver Declarations, ¶ 16). These "instructions and rules," however, are reasonable

6   commercial requirements, not an indication that Plaintiffs qualify as employees. Indeed, any

7   contractor hired to deliver a part for a company should reasonably expect that he or she will need

8   to update the company on the status of the delivery, notify the company if the delivery is not

9   made, and document the work he or she performed in order to get paid. *See, e.g., Trs. of Mich.*

10  *Reg'l Council of Carpenters Employee Benefits Fund v. Fox Bros. Co.,* No. 05-CV-70262-DT,

11  2005 U.S. Dist. LEXIS 38928, * 20 (E.D. Mich. Dec. 27, 2005) ("regardless of whether the

12  [plaintiffs] are employees or independent contractors, Fox Brothers has a legitimate interest in

13  monitoring the quality of the work (and, for that matter, whether the work was done at all)");

14  *Weary v. Cochran,* 377 F.3d 522, 526 (6th Cir. 2004) (requirement that person comply with

15  "certain administrative guidelines" is "not the type of control that establishes an

16  employer/employee relationship.") (citing *Oestman v. Nat'l Farmers Union Ins. Co.,* 958 F.2d

17  303, 306 (10th Cir. 1992)); *Desimone v. Allstate Ins. Co.,* No. C 96-03606 CW, No. C 99-02074

18  CW, 2000 U.S. Dist. LEXIS 18097, *37 (N.D. Cal. Nov. 7, 2000) (requirement that plaintiffs

19  submit reports on their work to defendant "is not necessarily indicative of Plaintiffs' status as

20  employees"). Plaintiffs offer no legal support for the conclusion that these administrative

21  requirements, which are memorialized in SCS' contracts (*See* Seguerra Decl., Ex. 1. p. C-1),

22  make it appropriate to examine the employment status of thousands of couriers in a single

23  collective action.

24        Finally, the declarants, like Plaintiffs, confirm that all of their work was assigned

25  to them by dispatchers. (*See* Plaintiffs' Driver Declarations, ¶ 9). The declarants do not identify

26  the particular dispatchers who assigned jobs to them. (*Id.*) However, many of them indicate that

27  the dispatchers they worked with did not allow them to turn down assignments, did not permit

28  them to negotiate special rates, and required them to wait at specific locations to receive

- 20 -

1   assignments. (*See* Plaintiffs' Driver Declarations, ¶¶ 10, 13, 19).  To the extent that dispatchers

2   engaged in these acts, they departed from SCS' common policy.  Furthermore, as described

3   above, most couriers across the country are not subject to these restrictions.

        **5.**    **Plaintiffs Admittedly Have No Personal Knowledge of the Work**
                    **Performed by SCS Couriers Nationwide.**

6         Plaintiffs also have no basis for claiming they are similarly situated to couriers

7   across the country because they admitted at deposition that they have no personal knowledge of:

8             • The work performed by couriers outside of California; (Chortabtim Dep. 139:12-

9               17; LaBrie Dep. 185:5-16; Macias Dep. 141:23-142:1; Millman Dep. 174:19-

10              23; Sison Dep. 131:9-14).

11            • Whether other couriers were subject to fewer rules than they were; (Chortabtim

12              Dep. 139:18-140:1; LaBrie Dep. 185:17-21; Macias Dep. 142:2-4; Millman

13              Dep. 174:24-175:1; Sison Dep. 131:15-18).

14            • Whether other couriers have incorporated businesses; (Chortabtim Dep. 140:5-7;

15              LaBrie Dep. 186:1-24; Millman Dep. 175:5-176:3; Sison Dep. 131:22-24).

16            • Whether other couriers negotiate the rates they are paid for deliveries; and

17              (Chortabtim Dep. 140:24-141:1; LaBrie Dep. 187:15-16; Macias Dep. 142:14-

18              17; Millman Dep. 176:19-21; Sison Dep. 132:24-133:2).

19            • Whether other couriers prefer to be classified as independent contractors.

20              (Chortabtim Dep. 141:2-4; Macias Dep. 142:18-20; Sison Dep. 133:3-5).

21        In *Pfaahler,* the court declined to conditionally certify a collective action involving

22  alleged misclassification of independent contractors, noting that the plaintiff provided "no

23  grounds indicating his knowledge of the work other workers performed, the circumstances under

24  which work was performed, or the circumstances of potential claimants affecting their desire to

25  work as independent contractors or employees." *Pfaahler,* 2000 U.S. Dist. LEXIS 1772 at * 6.

26  Plaintiffs have no more personal knowledge here.  They purport to be similarly situated to

27  thousands of couriers from 45 different states, but testified under oath that they know little, if

28  anything, about their work.  Plaintiffs' admission that they do not have personal knowledge about

CASE NO. 3:08-CV-03182 PJH         DEF.'S MEM. OF LAW ISO OPP'N TO MOT. FOR
                                        CLASS CERTIFICATION AND NOTICE

1   work of other couriers belies their contention that they are similarly situated to them. *Id.; see also*

2   *Hinojos,* 2006 U.S. Dist. LEXIS 95434, at * 3 (denying conditional certification motion and

3   noting that "plaintiffs concede that they have 'little personal knowledge of defendant's FLSA

4   violations outside of Las Vegas'").

5       **B.    The *Air Couriers* Decision is Inapposite to this Court's Determination**

6           Plaintiffs inaccurately state that the issue of whether SCS' couriers are properly

7   classified as independent contractors was previously resolved in *Air Couriers Int'l v. Employment*

8   *Dev. Dep't,* 150 Cal. App. 4th 923 (Ct. App. 2007).  In that case, the court held that drivers who

9   made deliveries for Sonic Air, a predecessor delivery company acquired by SCS, qualified as

10  employees for "purposes of the Unemployment Insurance Act." *Id.* at 940.  The case involved a

11  different party and involved state law taxation issues, rather than federal wage-and-hour issues.

12  Furthermore there are key factual differences between *Air Couriers* and this case.  For example,

13  in *Air Couriers*, the company failed to produce evidence of contracts with the drivers. *Id.* at 931.

14  Here, SCS scrupulously maintained contracts with its couriers.   In addition, Sonic Air was a

15  dedicated pick-up and delivery service, while SCS is a global logistics company, only one part of

16  which involves arranging deliveries and pick up of parts. *Id.* at 938.  This distinction is crucial

17  because the determination of whether an individual qualifies as an independent contractor

18  depends, in part, on whether the service rendered is an integral part of the employer's business.

19  *Real,* 603 F.2d at 754.  Because the *Air Couriers* decision involved a different party, arose in a

20  different legal context, and presented dissimilar facts, it has no bearing on Plaintiffs' claims in

21  this lawsuit.

22      **C.    Plaintiffs' Proposed Notice is Deficient**

23          If the Court reaches the issue of the form of Plaintiffs' proposed notice, SCS notes

24  that it is deficient in three material aspects.

25          First, the styling of the notice—which includes the name of the district judge

26  assigned to this case and states in bold and italics that a "court authorized this notice"—

27  reasonably could be perceived by a non-lawyer as a judicial endorsement of Plaintiff's claims.

28  The Supreme Court has cautioned courts to avoid "even the appearance" of any judicial

- 22 -

1    sponsorship of plaintiffs' claims. *Hoffman-LaRoche,* 493 U.S. at 174; *see also Boyd v. Jupiter*

2    *Aluminum Corp.,* No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654, at *18 (N.D. Ind.

3    May 31, 2006) (requiring removal of name of district judge from caption on notice).

4            Second, the notice contains a detailed description of Plaintiffs' allegations, but

5    mentions only as an afterthought that SCS "denies that it has violated the FLSA." The notice

6    should contain a more thorough description of SCS' position in this lawsuit. *Gerlach,* 2006 U.S.

7    Dist. LEXIS 24823 at * 13 (not allowing "one-sided and argumentative" description of lawsuit in

8    notice).

9            Third, the proposed 120-day time period for response is inappropriately long. The

10   Court should permit enough time for potential claimants to opt-in, but sufficiently short for the

11   parties to resume the discovery process without fear of contacting represented parties. SCS

12   recommends a 30-day response period.[14]

13   **IV.   CONCLUSION**

14           For the foregoing reasons, Plaintiffs have failed to demonstrate that they are

15   similarly situated to SCS couriers' nationwide, and their motion for conditional certification of a

16   collective action should be denied.

17

18   DATED: January 21, 2009              PAUL, HASTINGS, JANOFSKY & WALKER LLP

19

20                                        By: _____

21                                              ROBERT P. KRISTOFF

22                                        Attorneys for Defendant

23   LEGAL_US_W # 60866300.9

24

25

26   _____

27   [14] *See, e.g., King v. ITT Cont'l Baking Co.,* No. 84 C 3410, 1986 U.S. Dist. LEXIS 29321, at *15 (N.D. Ill. Feb. 18, 1986) (30 days); *Watkins v. Milliken & Co.,* 613 F. Supp. 408, 420 (W.D.N.C. 1984) (30 days); *Held v. Nat'l R.R. Passenger Corp.,* 101 F.R.D. 420, 423 (D.D.C. 1984) (30

28   days); *Johnson v. Am. Airlines, Inc.,* 531 F. Supp. 957, 961 (N.D. Tex. 1982) (21 days).

- 23 -